People v. Gordon. For the attorney, we have Mr. Cross. And for the athlete, we have Ms., I wish I could remember, but I want to pronounce it correctly. Would you pronounce it for me? Bergus. Bergus, okay. That A between R and G is silent. You may proceed, counsel. Thank you. Justices, Ms. Bergus, may it please the Court? Counsel? We're here on an appeal of a termination of parental rights that took place in Sangamon County. The fitness hearing took place in December of 2016 where the father was found unfit. My argument will primarily concentrate on the fitness portion. But on February 22nd, the best interest hearing took place and the father's parental rights were terminated. We have argued, or I have argued, that the Court erred in finding the father unfit. Primarily, the Court erred because I don't think the Court took into account the communication issues that arose during the case between the father and the caseworker. Now, I know that the worst argument I can come in and present to you is, hey, it's all the caseworker's fault. I understand that. And I don't mean to do that. But in this case, the lack of communication between the caseworker and the father is pretty egregious. Who has more time? Pardon? Who has more time to communicate? Well, certainly in this case, the father would have had more time. The father expressed to the caseworker early on in the case that he was having a problem with mail. He moved from Jacksonville to East Moline during the process. And so there was early disclosure that there was a mail issue. Did that prevent the father from having contact with or in terms of corresponding at least to his child? Because that's something you look at, whether or not dad sent letters or gifts, cards, that type of thing. Did this disconnect between his communication with the caseworker, did that impact his ability to do that in any way? Well, I'm stuck with the record for the trial court. And there's no evidence that those kind of actions took place. And I know in Judge Tharpe's order, she concentrated on that relationship or lack of a relationship in her order. However, when the caseworker realized very, very late that she was able to conduct the intake assessment over the phone and not in person, she found two things, only two tasks the father would have to do. Take a parenting class, which everybody has to do, and take a drug assessment. Not participate in drug counseling, just take a drug assessment. Presumably the parenting classes, had they been ordered six months earlier, could have solved that problem. And one of the things that the attorney in the trial court argued is, you know, we have to give this guy a fair chance to at least participate in the parenting classes. He was scheduled to get out in March 2017. At least give him the opportunity. The delay was not his fault. I understand this communication misunderstanding of whether the intake assessment or the integrated assessment has to take place in person. It didn't have to take place in person, so it could have taken place months earlier. The father would have gotten into parenting classes. Presumably those communications could have started. I understand the question and I understand what the record shows with regard to communication. But this isn't a situation where one of the parents was somewhere in Springfield or somewhere in Bloomington and we couldn't track them down. Everybody knew, every hour of the day, exactly where this father was. And just as it was the father's responsibility to be in contact with the kids and the caseworker, the caseworker also had a responsibility to contact the father every month. She testified that she did not do that. And then when you come down, the father was not involved in any of the actions that caused the case to come into the department. And then when they integrated... The father was not involved, period. I understand. That is fair. But presumably, had the integrated assessment... Remember, the father was only asked to do three things. He was asked to cooperate with DNA testing. He did it immediately. Cooperate with an integrated assessment. I don't know how he could do any more than be available to handle the integrated assessment. There's an inference. This is an inference, I think, rather than direct evidence. There's an inference based on his response to the DNA testing that he knew a child existed and he wasn't surprised. Forget the DCFS assessment. What did he do from the time of the child's birth until somebody got a hold of him and did an assessment by phone? And how many years was that? Based on the record, I don't think there was any evidence even addressing that question. Well, there's evidence addressing a span of time in which, as far as we know, there was absolutely no contact. What I meant was there's no evidence suggesting he did what you are asking that he did. Right. And doesn't that show a rather blasé attitude toward parental responsibilities if you want to maintain contact with the child? I think it could represent that. But at the same time, when we offer services to any family that goes through the system, one of the things we're trying to do, especially with the parenting class, is get them involved, get them behaving. And this father did not have the opportunity to do that. And in this case, through no fault of his own, he wasn't missing appointments with the social worker or the investigator. Mr. Cross, are you saying he needed a parenting class to tell him that he needed to be in contact with his child, to communicate with his child, to send cards on their birthday or his birthday and show an interest? You need a parenting class for that? I'm not saying that because it's not in the record. But it's possible that the parenting classes that get assigned to everybody make all of them better parents. I mean, I don't have a response based on what happened in the trial court to that question. But that's why they have people. And people repair all kinds of poor parenting skills in the parenting classes. And this father said at the outset, I'm willing to cooperate with services. And then there was literally a month's, almost a year-long span where they didn't do the integrated assessment. At the integrated assessment, only two suggested services, a drug assessment, not drug counseling, just an assessment, and the parenting classes, which everybody is ordered. And again, this isn't somebody who's not cooperating. He's right there all the time, either in Jacksonville or East Moline. And still not showing any interest in the child and not asking about the child, nothing. It's almost as if this was just kind of something to do. I understand, Judge. I understand the question. But I think trial counsel suggested that that's why we needed to see how he does in these parenting classes, see what he does on his release day. I understand the record is absent of any details as to the father's approach to parenting issues. I understand that. But at the same time, we recommend these services. The system recommends services for a reason. And the parenting classes are, again, that's the most common thing, in my experience, that everybody has to do. And he doesn't even get a chance to participate in the parenting classes. For better or for worse, Judge Pope, that may be what it would take to get him to do that. I don't know what the record shows in this case, but I've seen cases that have come with people who are incarcerated who do take parenting classes in the prison system. I agree. And he could have taken the parenting classes in the prison system had the integrated assessment taken place and he been told to cooperate. Some people do it without being told because they're a parent and they feel they need to do that with the child in care. I agree. I know that. And I know that some people, even if they're not involved in the issues that gave rise to the case, aggressively ask the caseworker, what can I do? But in this case, he was told, take your DNA test, cooperate with the integrated assessment, and cooperate with the service provider. And I just don't see how you can say that he didn't do that. But the problem is, it's not as if, I agree that DCFS appears to have failed in their obligation to have the monthly contact with him. But the remedy for that is, okay, DCFS didn't do what they were supposed to do, you get your child. I mean, we're looking at a child and the best interest of that child, and when we look at his complete lack of interest in this child and showing no indication of any intent to care for this child, I just don't see where we have a leg to stand on, quite frankly. I appreciate that. Are you getting the drift of the questions? I am, and I'm almost done. But I just think that the record is not helpful to me on that issue. I mean, it's just not. But families are brought in for services, or the cases get brought in for a number of reasons. And sometimes the parents who are not involved in the reasons that bring the case to the department. So those people have to follow the directions of the department. In this case, we have somebody from the beginning, the record does show that he said, I'm willing to do it, cooperates with the DNA test. And the integrated assessment, there's just no reason it shouldn't have been done at the beginning. And I can't tell you what would have happened if letters would have been coming every week or cards. I don't know what would have happened. But this father wasn't given the chance to at least participate in the counseling. I understand by your question, this is way before counseling that he needed to take those steps. I appreciate that. But I think we have to look at what happened within the time of the service plan. So what I've asked for... But that, once again, that fails to focus on the seven or eight years before the children were brought to the attention of the state. And that, I mean, that isn't a non-factor. And again, maybe this is a sociological discussion, but then why assign these families to take parenting classes? Why do those things? Because most of the cases we see do not deal with someone who has been incarcerated for the entire life of the child, when that ends up being eight or nine or ten years. But maybe in some cases, and in this case, we assign the parenting classes because we have parents who really don't know what those things are. And that can weigh against them. I understand the way you look at the case. You didn't find out how to handle this. You didn't do anything. But we give them the classes so that they can improve, so that they at least have a chance to know what to do. But typically, we're giving those classes to a parent who's already somehow connected to the child, other than by an accident of birth. I understand. No services are provided to parents that exist. He exists in a biological sense, but to say that through no fault of his own, he didn't develop a... The fault is he violated the law and he got sent to prison. But I think that's why... One of the consequences is you may disrupt family life that exists or be unable to create a family life. But I think that's why trial counsel said, let's at least let him participate in the service. And let's at least start his nine months again. And maybe he won't do anything. But maybe he will, and that would be better for everybody. And so we have a child wait... It's horrible. I mean, it's horrible. I agree. But I don't know if it's the chicken or the egg. Then why assign the parenting classes? You assign the parenting classes so that we can improve their parenting. I get the feeling from the panel, and I appreciate it. But this... And again, I don't mean to completely blame the caseworker. But this could have been a very different case had there been contact and an assessment right off the bat. And who knows what would have happened. And I think that's what we're asking. To remand it and at least give him his chance to go through the program, the parenting classes, and an opportunity to do his nine months. Thank you. Thank you, counsel. Ms. Burgess. May it please the court. Good afternoon. My name is Amelia Burgess, and I'm appearing today on behalf of the people of the state of Illinois. As you've already established, this is a relatively straightforward case in regards to the fact that there is no dispute between the parties about the nature of the law or the facts that the court has to consider. The question today is whether or not the trial court erred and whether its determination, both that the individual in this case was an unfit parent, as well as that it was in the best interest of the minor to terminate parental rights, was against the manifest weight of the evidence. And in this particular case, the single area where there is a point of disagreement between the parties is the extent to which the family service plan should have or did guide the trial court's decision and the extent to which this court should consider the family service plan. Because the determination that Mr. Gordon was an unfit parent was not made pursuant to subsection M in this case, which is with regard to whether or not the parent has made meaningful and reasonable progress towards correction of the circumstances that led to removal of the child. That is a different area and an area that is heavily focused on the family service plan, because the intent and the purpose of the family service plan is to correct issues and to return the family to an acceptable level of responsibility on behalf of the parents. That is not what occurred here. In this particular instance, because of Mr. Gordon's lack of involvement in the child's life and complete lack of contact with the child, the court made its determination pursuant to subsection B, which asks a much more basic question, and that is simply whether or not the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare. It is the state's position, and this is a position supported both by the statutory language as well as Supreme Court precedent, that whether or not Mr. Gordon had any participation in the family service plan has no bearing on whether or not he showed a reasonable degree of concern for the interests of the minor child. That is generally a retrospective analysis, and it is one outside of the factors that led to the removal of the child. The state fully acknowledges in this particular instance Mr. Gordon, because of his absence, was not responsible for the removal of the child in this particular case, but that had to do with, unfortunately, the actions of the biological mother. However, that does not change the fact that the record is not devoid of evidence here. It actually has affirmative evidence that Mr. Gordon never, at any point in this child's life, made an attempt to find out anything about her. Never reached out to the biological mother. Once removal had occurred, never reached out to the caseworker or to the foster parents to say, how is she doing? Is there anything I can do to help, even given his limited circumstances? Has never sent her a birthday card, a letter, anything that would show that he had established an interest in becoming a parent. And that was an unfortunate choice, but it is a choice that has consequences, and one of the consequences is that there is no evidence to support a finding that he showed a reasonable degree of interest in the minor in this particular instance. As a result, it is the state's position that whether or not the family service plan was the best family service plan, or whether or not the caseworker in this particular case did everything or went above and beyond what was required, is an inquiry that is simply not relevant to the determination in their subsection B. And it certainly is an instance where the social worker may very well have realized, given the lack of Mr. Gordon's contact with the minor, that assigning him additional tasks, such as family, classes, et cetera, would not have corrected some of the issues that he faced in terms of his stated desire to become a parent. The final point that I would make is that, again, under subsection B, this is not perspective. We're not looking at what might happen in the future. We're looking at what actually has happened. So the fact that Mr. Gordon may want additional time and additional opportunities to show concern, unfortunately is just not an analysis that is pertinent to whether or not he has actually shown any interest in the minor. So as a result, the State would respectfully request that this Court affirm the trial court's ruling and find that the determinations that Mr. Gordon was an unfit parent, and that it was in the best interest of the minor to terminate the parental rights, was not against the manifest weight of the evidence. Thank you, Counsel. Any rebuttal, Mr. Cross? I agree that section B is a completely separate section than the section regarding the nine-month service plan. But in all the cases I've been a part of, the nine-month service plan is set up so that parents have the ability to make progress towards returning the child to their care, even if the child has never been a parent. And to say that in this case, because of circumstances between the caseworker and the father, essentially the father does not get his nine months, because that's what the ruling is. He does not get his nine-month period, because he did not get his integrated assessment until the, I believe, eighth month, and was not even told what the services were, because the caseworker said, we were getting ready to change the goal anyway at the next permanency review hearing. He did not get a fair shake at those nine months. And people come into cases, worse cases than this, with parenting problems, and get their nine months to try to make some progress. I agree that these are separate sections under which a fitness finding can be made, but the ruling of the trial board, and if it's affirmed, is that this gentleman did not get his nine months. Because he, A, never really got assigned any services, and B, didn't get the opportunity to take his parenting classes. I understand the court's questions regarding prior contact, but that's what the nine months is for. It's to see if you can make some progress. We'll take this matter under advisement and be in recess until the next case.